IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE LEUKEMIA & LYMPHOMA SOCIETY, INC.<br><br>    Plaintiff,<br><br>  v.<br><br>THE WALTER AND ELIZA HALL INSTITUTE OF MEDICAL RESEARCH,<br><br>    Defendant. | Case No. 22-CV-10690<br><br>**COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff The Leukemia & Lymphoma Society (LLS) files this Complaint and Jury Trial Demand against Defendant The Walter and Eliza Hall Institute of Medical Research (WEHI).

### Nature of the Case

1. The Leukemia and Lymphoma Society is a New York-based charity. LLS has granted over $2.75 billion for cancer research and direct patient support, including helping cancer patients afford therapy. LLS funds its mission through donations and royalties from the research it supports. For twenty years, LLS has funded research at The Walter and Eliza Hall Institute of Medical Research, totaling nearly $30 million in grants. WEHI described that funding as the "lynchpin" of its work on a new type of cancer therapy. WEHI licensed that LLS-funded work to a pharmaceutical company but failed to notify LLS, as required by their agreement. WEHI has received over $325 million from that license. Now it refuses to honor its agreement to share a portion of that income with LLS, the charity that funded its work. LLS brings claims for breach of contract, breach of the duty of good faith and fair dealing, and fraud and fraudulent concealment.

1

## Parties

2. LLS is a 501(c)(3) not-for-profit public charity incorporated in the State of New York. Its principal place of business is 3 International Drive, Rye Brook, New York 10573.

3. WEHI is a not-for-profit organization incorporated in Australia. On information and belief, its principal place of business is 1g Royal Parade, Parkville, Victoria 3052, Australia.

## Jurisdiction and Venue

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). This is a civil action between a citizen of New York and a citizen of Australia. The amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

6. The claims asserted in this litigation arise from sustained business activity transacted by WEHI in New York. From 2000 to present, WEHI solicited funds from LLS, a New York citizen, including submitting numerous grant applications for review by LLS's New York-based grant review board and Board of Directors. WEHI entered into a series of grant agreements with LLS; submitted its written annual grant reports to LLS's New York office; and travelled to Manhattan to provide live annual reports to LLS on its use of LLS funding. WEHI made statements and omissions at those Manhattan meetings underlying some of the breach and fraud allegations herein.

7. Throughout that time, WEHI also solicited funds from other New York donors, including through a New York-based solicitation service. In 2021, WEHI marketed a fundraising event to New York residents at "one of New York City's newest rooftop bars" to "celebrate their WEHI connection."

**Statement of Facts**

8. LLS was founded in 1949 by a New York couple, Rudolph and Antoinette Roesler de Villiers, who lost their son Robert to leukemia at the age of 16.

9. At the time, leukemia was 100% fatal.

10. LLS began with a few volunteers and a small budget. Today, LLS is the world's largest charity dedicated to finding a cure for blood cancers.

11. Since its founding, LLS has provided more than $1.25 billion in direct patient support, including funding access to cancer therapies, and invested more than $1.5 billion in blood cancer research. LLS funding has helped create some of the most innovative approaches to blood cancers.

12. LLS uses approximately 60% of its current annual budget for direct support of cancer patients. Last fiscal year, LLS provided $385.3 million to patients.

13. LLS uses the remaining approximately 40% of its budget for funding cancer research.

14. The need for patient and research support exceeds LLS's available funds. Every year, LLS must turn down qualifying applications for both patient support and research at leading institutions.

15. LLS funds its operations through (i) donations and (ii) royalties from grant agreements, when LLS-funded research produces commercial income.

16. WEHI is an Australian research institute with a positive academic reputation.

17. From 2000-2022, LLS provided WEHI nearly $30 million in research funding.

18. LLS funded WEHI's research on BCL-2 proteins. WEHI licensed that knowledge to a pharmaceutical company. WEHI made over $325 million from that license but failed to honor

its obligations to LLS under the grant agreements to notify LLS of the license and share a portion of the commercial income.

**A. LLS funded WEHI's work on BCL-2**

19. WEHI used LLS funding to research a new type of cancer therapy focused on apoptosis (cell death) and the BCL-2 family of proteins.

20. In 2000, WEHI applied for a grant to establish a Specialized Center of Research (SCOR) on the WEHI campus. SCOR Grants are LLS's most prestigious grants and amount to at least five million dollars over five years, subject to annual review and renewal, to study a specific issue. Specifically, WEHI applied for LLS SCOR Grant 7015-02 to study apoptosis and BCL-2, including the "central role of the Bcl-2 family in controlling apoptosis" and "[r]ational design of drugs that target the Bcl-2 family."

21. WEHI received $7,500,000 from LLS under this Grant from July 1, 2000 to June 30, 2005 (LLS Grant 1).

22. In 2005, WEHI applied for LLS SCOR Grant 7413-07 to study apoptosis and BCL-2, including to "develop new therapeutic approaches based on targeting Bcl-2-like proteins" and to understand "BH3 mimetics" that "directly engage Bcl-2 and its close relatives."

23. WEHI received $6,250,000 from LLS under this Grant from July 1, 2006 to June 30, 2011 (LLS Grant 2).

24. This LLS funding "contributed to the many years of research that underpinned the Institute's [WEHI's] knowledge of the cellular biology of the BCL-2 proteins."

25. According to WEHI, this "generous and long-term funding from the LLS has permitted us to pursue broad-ranging research underpinning new therapies for cancer, in particular work to define the roles of pro-survival and pro-death BCL-2 family members."

4

### B. WEHI licensed its LLS-funded BCL-2 work to Genentech

26. In December 2006, WEHI signed a collaboration and license agreement with the pharmaceutical company Genentech, receiving an up-front payment and the potential for a percentage of future drug sales.

27. The purpose of the collaboration was to investigate potential therapeutic agents inhibiting the BCL-2 family of proteins for the treatment of cancer.

28. WEHI obtained this agreement because of its LLS-funded research. According to WEHI:

- "More than $20 million in support through this program has **enabled** a team of researchers at the Institute to pursue a long-term program that … **underpinned** the development of a new class of anti-cancer drugs."

- "LLS funding **allowed** our SCOR in 2001 to commence the challenging search for BH3 mimetic drugs, and the progress we made **prompted** Genentech in 2007 and later also Abbott to seek collaboration."

- LLS funding "aided the generation of a profound body of knowledge, which in turn **allowed** us to work with collaborators to develop and test the BCL-2 inhibitor venetoclax (ABT-199)."

- "Our SCOR's own efforts to develop BH3 mimetics **led** in 2006 to a remarkable collaboration with two strong commercial partners (Genentech and Abbott)."

- LLS funding was the "**lynchpin** of our work in the search for a new way to ameliorate leukemia and lymphoma."

5


29. The collaboration involved WEHI licensing to Genentech "the vast array of background knowledge possessed by the Institute [WEHI]" on the BCL-2 family of proteins, which LLS funded.

### C. WEHI did not disclose the license to LLS

30. At that point, under the SCOR Grants, WEHI was required to, but did not, disclose to LLS the potential Genentech license and agreed in writing to share a portion of the royalties.

31. LLS Grants 1 and 2 specifically contemplate the terms for "license options resulting from research conducted by Grantee and funded in whole or in part by the Society."

32. The Genentech license resulted from research conducted by WEHI and funded in whole or in part by LLS. Per WEHI, LLS funding "enabled" WEHI to commence this research, was the "lynchpin" of this work, and "led" to the Genentech agreement.

33. Pursuant to the LLS Grant 1 and 2 agreements, WEHI "shall, **concurrently when entering into such a license agreement**, agree in writing to pay the Society a portion of the equity and/or royalty amount received by [WEHI] under such license agreement, the amount to be paid to the Society to reflect the proportion of research funding contributed by the Society."

34. WEHI also committed that it would protect the IP of LLS-funded work and offer to transfer title to LLS before abandoning IP rights of any type.

35. WEHI also committed that during the pendency of the grants, it would not participate in any agreement involving the research for the "exclusive benefit" of WEHI.

36. WEHI did not notify LLS in December 2006 that it was planning to license LLS-funded research and know-how to Genentech, much less agree in writing to share a portion of the resulting income with LLS.

37. In fact, WEHI did not disclose the existence of the Genentech license to LLS for a decade.

38. Instead, WEHI engaged in a pattern of deception, while seeking millions more in LLS funding.

39. WEHI first mentioned the Genentech collaboration to LLS in May 2007, in its Grant 2 Year 1 report. WEHI stated it had entered into a "strategic alliance" with Genentech but reassured LLS that it "**in no way overlaps** the support we are receiving from the Society."

40. WEHI failed to disclose that its "strategic alliance" involved licensing LLS-funded research to Genentech.

41. In 2008, WEHI and Genentech added AbbVie (then Abbott) to their collaboration, but again WEHI did not notify LLS or seek to share its returns.

42. In January 2009, as part of a routine audit, LLS sent an email to WEHI inquiring "if any of the IP created during or in-part with its funding is being used in a commercial setting or licensed out for further development to a company."

43. WEHI did not respond.

44. When LLS followed up, WEHI replied in March 2009, disclosing its collaboration with Genentech and AbbVie, not mentioning the licensing agreement, and again reassuring LLS that WEHI had been "very conscientious about maintaining our IP" arising from the "funding provided to us by the LLS via formation of a SCOR within our institute."

45. Again, WEHI did not disclose that it had licensed LLS-funded work.

46. In subsequent communications with LLS, WEHI made no mention of the license.

47. At the next annual grant presentation in Manhattan, WEHI's Head of SCOR Dr. Jerry Adams again reassured LLS's Allison Formal, then VP of Research Business Development,

in person that WEHI had protected its IP, omitting any reference to the Genentech license. Dr. Adams also failed to disclose the licensing arrangement at subsequent annual meetings in Manhattan.

48. In June 2011, in its final Grant 2 report, WEHI referenced the "the commencement of our collaborative research agreement with Genentech during the previous reporting period" but again failed to mention the license portion of the collaboration and license agreement.

49. From 2011 to 2016, WEHI continued to solicit LLS for millions of additional dollars to continue working on BCL-2 therapy: "We seek further LLS funding to explore the full potential of this approach for treating hematopoietic malignancies."

50. WEHI did not disclose the license at any point during this time, much less explain whether that additional LLS-funded work would be transferred to Genentech under the license.

51. WEHI received two more consecutive SCOR grants from 2012-2022, resulting in another $11,250,000 to WEHI.[1] In all, WEHI's total support from LLS to date is nearly $30,000,000.

52. WEHI entered into each of these additional grants under the same commitment that it was not undertaking such research for its own "exclusive benefit."

53. In April 2016, AbbVie and Genentech released the first successful BCL-2 inhibitor, called Venclexta® (generic name "venetoclax").

54. WEHI still did not disclose its license of LLS-funded research to Genentech nor report any income from BCL-2 therapy to LLS.

---

[1] Those grants (Grants 3 and 4) are subject to arbitration under New York law and seat. No claims are asserted as to Grants 3 or 4, whether arising in contract, tort, or otherwise. All claims herein are expressly and solely asserted as to Grants 1 and 2, and any information herein relating to subsequent grants is for context only.

55. LLS reached out to WEHI in early 2017 to inquire whether WEHI might receive royalties from Venclexta®, noting "LLS may be entitled to return on our grant investment to WEHI, if WEHI has received funds (possibly from a pharma company) related to our SCOR support."

56. WEHI delayed responding, blaming the delay on one of its employees being on sick leave ("It may be that the strain of his long absence has led to some lapse in communication within that Office.").

57. But WEHI had not actually been offline or idle.

58. On July 26, 2017, WEHI's Executive Director, Doug Hilton, sent a letter to LLS. For the first time, **ten years after the fact**, WEHI revealed that it had licensed LLS-funded research to Genentech in 2006.

59. Dr. Hilton wrote: "The Genentech collaboration involved the licensing-in of the vast array of background knowledge possessed by the Institute, as well as certain assays and research tools" including research "funded by LLS which contributed to the background knowledge of the Bcl-2 proteins."

60. Dr. Hilton also revealed: "The Institute will shortly be announcing that it has monetised the royalty that is due to it under the collaboration with Genentech to a third party in return for an up-front payment."

61. **The next day**, WEHI announced publicly that it had made "a landmark deal worth up to US$325 million from the partial sale of royalty rights in anti-cancer treatment venetoclax," plus potential future royalties.

9

62. Thus, WEHI hid the fact that it licensed LLS-funded research for 10 years, then disclosed this fact one day before announcing it had sold the rights it received in return to a third party.

63. Dr. Hilton's letter to LLS ended with a quick note making clear that (1) WEHI was aware of its income-sharing obligations under the LLS Grants and (2) it was not going to honor them.

64. Dr. Hilton wrote: "The Institute maintains, as it has always done, the view that LLS's funding did not produce any intellectual property which the Institute has commercialised."

65. There were two problems with this statement. First, WEHI had never – much less "always" – "maintained" this view to LLS, because it had hidden the existence of the license for a decade before sending the letter. Second, WEHI *had* commercialized LLS-funded IP by *licensing* it to Genentech upon entering the Genentech agreement.

66. WEHI has conceded that, once within the Genentech collaboration, it neither discovered venetoclax nor contributed any novel IP toward that therapy. Rather, it ran tests, for which it was independently compensated. Thus, the only consideration for the royalty interest was the in-licensing and provision of WEHI's LLS-funded know-how, to which it agreed upon entry to the contract.

67. WEHI has repeatedly admitted as much. Dr. Hilton conceded: "the Institute's royalty was based not on its own discovery, but based on the development of a discovery of others, for which no Institute scientist is an inventor, and which was funded wholly by Genentech and AbbVie." In WEHI's own words, its role was "fundamentally" to "assist" in the development of a drug "discovered" by AbbVie.

68. In other words, at the end of the day, all WEHI had to sell was the "vast array of background knowledge possessed by the Institute," which LLS funded in major part.

69. WEHI breached its contracts with LLS. It took tens of millions of dollars from a charity. It used that money to build its expertise in BCL-2 and BH3 mimetic therapy. It sold that expertise to pharmaceutical companies and hid that fact from the charity that funded its work. It then reaped over $325 million dollars – with the potential for more – for contributing nothing but the experience LLS paid for. And it managed this through a ten-year pattern of deception and misdirection, hiding the ball for a decade then revealing it one day before the buzzer. WEHI's conduct in deceiving a cancer charity is unconscionable, and it should be held accountable.

## LEGAL CLAIMS

### Count I: Breach of Contract

70. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

71. The parties entered into a valid and enforceable Grant 1 and 2 Agreements containing a royalty provision "with the amount to be paid to [LLS] to reflect the proportion of research funding contributed by [LLS]."

72. The conditions for LLS to receive a royalty have been met. WEHI licensed intellectual property resulting from work funded in whole or in part by LLS under the Grant 1 and 2 Agreements to Genentech and AbbVie, and WEHI derived at least $325 million as a result.

73. LLS has performed all of its obligations under the Grant 1 and 2 Agreements.

74. WEHI breached the terms of the Grant 1 and 2 Agreements by failing to disclose the potential licensing to LLS, by failing to concurrently agree in writing to pay LLS a portion of amounts derived from the license, by refusing to "share with the Society all income derived from

11

such invention or other intellectual property," by participating in an agreement or activity "for the exclusive benefit" of WEHI, and by breaching the requirement to subcontract with any third party collaborator ("Participating Institution") on the same terms as the preceding LLS grant to protect LLS's rights, and by breaching its obligation to report on its conduct under the grants, among other acts and omissions.

75. As a direct and proximate result of WEHI's breach of its contractual obligations, LLS has suffered, and continues to suffer, damages in an amount to be determined by a jury at trial. WEHI has repeatedly conceded that the Genentech license resulted from research conducted by WEHI and funded in whole or in part by LLS – and that this LLS funding "enabled" WEHI to "commence" this research, was the "lynchpin" of this work, "prompted" Genentech and Abbott to seek collaboration, and "led" to the Genentech agreement. Moreover, WEHI has repeatedly affirmed that it committed nothing inventive within the Genentech collaboration but merely contributed its background expertise, which was "enabled" and "allowed" by LLS-funded research. Therefore, while a jury will determine "the amount to be paid to the Society to reflect the proportion of research funding contributed by the Society," LLS's contribution to the research leading to the Genentech agreement is no less than 25-50% in light of the weight WEHI has repeatedly afforded it.

76. In addition, LLS is entitled to specific performance of the Grant 1 and 2 agreements with respect to any future income WEHI receives from the Genentech agreement or monetization.

### Count II: Breach of the Covenant of Good Faith and Fair Dealing

77. LLS incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.[2]

78. In addition and in the alternative to recovery for breach of contract, LLS is entitled to recover for WEHI's breach of the implied covenant of good faith and fair dealing inherent in every contract.

79. The parties entered into valid and enforceable Grant 1 and 2 Agreements. LLS has performed all of its obligations under the Grant 1 and 2 Agreements.

80. When WEHI contracted to receive millions of dollars from a New York charity and travelled annually or more to New York to report on its conduct with those funds, WEHI came under a duty to "fulfill any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract," such as a promise that its reporting would be accurate and truthful. WEHI was also required to refrain from undertaking any action to deprive LLS of the benefits of the parties' agreements. That would include refraining from misleading LLS about the disposition of its funded research, the protection of its rights, and the nature of WEHI's dealings with industry partners, as well as delaying responses and disclosures for years then springing "notice" on LLS less than a day before the sale of LLS's interests was announced. WEHI also had a duty not to act "in bad faith as part of a scheme to deny [LLS] of the benefit of their bargain," and the conduct described herein evinces WEHI's knowledge, intent, pattern, motive, and, consequently, bad faith.

---

[2] All claims in this Complaint as to Grants 1 and 2 are asserted in addition and in the alternative to one another. Each claim as to Grant 1 is deemed asserted as to Grant 2 and vice versa. To the extent LLS does not recover all owed royalties under one grant, it seeks the remainder under the other.

81. As a direct and proximate result of WEHI's breach of the covenant of good faith and fair dealing, LLS suffered damages and is entitled to recover an amount to be determined by a jury at trial, again not less than the frustrated contractual promise of a 25-50% royalty or greater.

### Count III: Fraud and Fraudulent Concealment

82. LLS incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

83. In addition and in the alternative, to the extent these allegations are not covered by the aforementioned claims, WEHI committed fraud on LLS, fraudulently induced LLS to enter into each annual renewal of the SCOR grant, and fraudulently concealed its conduct for over a decade (and thus separately also negates any purported limitations defense).

84. A party commits fraud or fraudulent inducement when it (1) makes a material misrepresentation of fact, (2) knows the statement is false, (3) intends the statement to defraud, (4) induces reasonable reliance on the part of the plaintiff, and (5) damages the plaintiff. A party commits fraudulent concealment when it (1) fails to discharge its duty to disclose information, (2) intends its omission to defraud, (3) induces reasonable reliance on the part of the plaintiff, and (4) damages the plaintiff.

85. WEHI repeatedly made intentionally false and misleading representations to LLS about its conduct, including its licensing of LLS-funded research to Genentech and the nature of its collaboration with Genentech and AbbVie. This includes without limitation the fraudulent statements and omissions detailed above. Among other things, in its May 2007 Grant 2 Year 1 report, WEHI falsely claimed, despite knowledge to the contrary, that its strategic alliance with Genentech did not overlap with the support it received from LLS. This statement was signed and sworn to by WEHI Head of the SCOR Jerry Adams. In a March 2009 email from Dr. Adams to

LLS's Allison Formal, WEHI falsely claimed, despite knowledge to the contrary, that it had been "conscientious" about ensuring that IP arising from LLS funding was appropriately protected. Dr. Adams repeated this claim in person in Manhattan, as well as the corresponding omission (failing to disclose the license). He also failed to reveal the license at subsequent annual meetings.

86. WEHI failed to disclose either the existence or the extent of its December 2006 licensing agreement to LLS for more than ten years. By way of example, in its Grant 2 Year 1 report, WEHI stated it had entered into a "strategic alliance" with Genentech but reassured LLS that it "**in no way overlaps** the support we are receiving from the Society" and omitted that the collaboration involved licensing LLS-funded research to Genentech. In this and other statements, WEHI repeatedly induced LLS to annually renew the SCOR grant.

87. WEHI made these statements and omissions intending for LLS to rely on them and to refrain from protecting its rights until WEHI's collaboration with Genentech and AbbVie was complete and its subsequent sale of LLS's rights was done. But for WEHI's failure to disclose the anticipated license agreement in 2006, LLS would have protected its rights and ensured a negotiated sharing of income *before* WEHI entered into the Genentech agreement and before WEHI obtained its money and sold LLS's rights out from under it. As a result, WEHI must return LLS to the status quo ante, which would be the negotiated fair royalty proportion reflecting LLS's role as major funder of the research leading to the license. In the alternative, WEHI fraudulently induced LLS into the quarterly payments and annual renewals of the grant agreements through these misrepresentations and omissions and must disgorge those funds to LLS.

**Request for Exemplary Damages**

88. Punitive damages are available for claims arising from breach of contract and breach of good faith and fair dealing when the defendant's conduct is egregious and evinces a "disingenuous or dishonest failure to carry out the contract."

89. WEHI's conduct, detailed above, shows a decade-long pattern of intentional deceptive conduct, designed to cheat a public charity that channels donated resources to cancer patients and funds research to find cures. In willfully breaching its obligations to LLS and misleading LLS, WEHI acted with a high degree of moral turpitude constituting egregious misconduct.

90. Punitive damages are also available for fraud.

91. Notably, punitive damages are appropriate "not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future." Future institutions should not view WEHI's shameful fundraising strategy as a successful business model.

**PRAYER FOR RELIEF**

WHEREFORE, LLS respectfully requests judgment as follows:

(i) an award of damages in an amount to be determined at trial, but not less than 25-50% of the commercial income that WEHI has derived from the licensing of its BCL-2 research and the sale of those licensing rights to date, plus any other amounts to be determined as well as future income;

(ii) an injunction ordering WEHI to share that percentage of future commercial income derived from same;

(iii) punitive damages in an amount to be determined at trial;

(iv) pre-judgment and post-judgment interest;

(v) reasonable and necessary attorney's fees and costs; and

(vi) any other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues triable to a jury.

Dated: December 19, 2022

**DLA PIPER LLP (US)**

*/s/ Andrew Jay Peck*
Andrew Jay Peck
andrew.peck@us.dlapiper.com
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Tele: 212.335.4500

Daniel L. Tobey, MD
*Pro hac vice forthcoming*
danny.tobey@us.dlapiper.com
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
Tele: 214.743.4500

Ashley Allen Carr
*Pro hac vice forthcoming*
ashley.carr@dlapiper.com
303 Colorado Street, Suite 3000
Austin, TX 78701
Tele: 512.457.7000

Karley T. Buckley
*Pro hac vice forthcoming*
karley.buckley@us.dlapiper.com
845 Texas Avenue, Suite 3800
Houston, TX 77002
Tele: 713.425.8400

*Attorneys for Plaintiff The Leukemia & Lymphoma Society*