UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
THE LEUKEMIA & LYMPHOMA SOCIETY,
INC,

              Plaintiff,

        - against -

THE WALTER AND ELIZA HALL INSTITUTE
OF MEDICAL RESEARCH,

              Defendant.
-----------------------------------X

**MEMORANDUM AND ORDER**

22 Civ. 10690 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    In 2000, the Leukemia & Lymphoma Society ("plaintiff") awarded the Walter and Eliza Hall Institute of Medical Research ("defendant") a competitive research grant, which was renewed three times over the following twenty years, for a total of nearly $30 million in research funding. Under the grant agreement, if defendant licensed any plaintiff-funded research to a third party, defendant was obligated to "concurrently" enter into a royalty sharing agreement with plaintiff. Plaintiff alleges that in 2006, defendant licensed research that was funded by plaintiff to Genentech, a pharmaceutical company. According to plaintiff, defendant not only failed to concurrently disclose the existence of this licensing agreement, but it also embarked on a decade-long campaign to fraudulently conceal the true nature of its relationship with Genentech. In July 2017, defendant finally

revealed to plaintiff the existence of its licensing agreement with Genentech, only one day before defendant publicly announced that it had completed a lucrative deal to sell its royalty rights to a drug that was developed as a result of its collaboration with Genentech.

Plaintiff filed this suit on December 19, 2022, asserting three claims against defendant: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) fraud.  Defendant has moved to dismiss those claims as untimely and/or duplicative, or, in the alternative, to dismiss the action in its entirety under the doctrine of forum non conveniens.  For the following reasons, defendant's motion is granted in part and denied in part.

## BACKGROUND

**A.  Factual Background[1]**

**1. The Parties**

Plaintiff is a 501(c)(3) not-for-profit public charity incorporated in New York with its principal place of business in

---

[1] The following facts, taken from the amended complaint (ECF No. 39), are assumed to be true for the purposes of this motion.  See Kalnit v. Eichler, 264 F.3d 131, 135 (2d Cir. 2001).  Pursuant to the parties' protective order, which was so-ordered by this Court, the amended complaint contains information that the

Rye Brook, New York.  ECF Nos. 39 ("Am. Compl.") ¶ 2.  Plaintiff is the world's largest charity dedicated to finding a cure for blood cancers.  Id. ¶ 10.  Since its founding in 1949, plaintiff has provided more than $1.25 billion in direct patient support and invested $1.5 billion in blood cancer research.  Id. ¶¶ 8, 11. Presently, plaintiff uses approximately 60 percent of its annual budget for direct support of cancer patients and the remaining 40 percent to fund cancer research.  Id. ¶¶ 12-13.  To fund its operations, plaintiff relies on both donations as well as royalties from grant agreements, when, as relevant here, research that was funded by plaintiff produces commercial income.  Id. ¶ 15.

Defendant is a not-for-profit organization incorporated and located in Australia.  Id. ¶ 3.  According to the operative

---

parties deemed confidential and that was redacted from the public filing.  See ECF No. 37.  This information is largely based on documents produced during the parties' arbitration regarding two research grants that are not at issue here. See Am. Compl. ¶ 102.  However, "even if material is properly designated as Confidential . . . by a protective order governing discovery, the same material might not overcome the presumption of public access once it becomes a judicial document." Dodona I, LLC v. Goldman, Sachs & Co., 119 F. Supp. 3d 152, 155 (S.D.N.Y. 2015).  At the time the parties filed the protective order, the Court had no way to anticipate that the information and documents marked as confidential and later filed with defendant's motion to dismiss are central to the resolution of the motion.  See Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006) (stating that the presumption of public access is greatest where the information concerns "matters that directly affect an adjudication").  Because the material does not raise any countervailing considerations that would weigh against its public disclosure, the Court will not redact the information deemed confidential under the parties' protective order, which does not bind the Court.  Moreover, because this case is going forward, the documents from the prior arbitration that the parties marked as confidential will be discoverable and thus disclosed in this litigation.

complaint, defendant is a research institute with a "positive academic reputation" that focuses on, among other things, developing new types of cancer therapies.  Id. ¶ 16.  At all relevant times, Dr. Jerry Adams ("Dr. Adams"), a dual United States and Australian citizen, was defendant's director, lead grant applicant, and head of its Specialized Center of Research.  Id. ¶ 6.

**2. The Grants**

In 2000, defendant applied for a grant from plaintiff to establish a Specialized Center of Research ("SCOR") on its campus. Id. ¶ 20.  These so-called SCOR grants, which amount to at least five million dollars over five years, are plaintiff's "most prestigious" grants and require the recipient to study a specific issue related to cancer research.  Id.  In this case, defendant applied for plaintiff's SCOR grant to study the effect of the BCL-2 family of proteins on apoptosis (or, cell death).  Id. ¶¶ 19-20.  Defendant was awarded the SCOR grant and received $7,500,000 from plaintiff between July 1, 2000 and June 30, 2005 pursuant to the grant ("Grant 1").  Id. ¶ 21.

In 2005, defendant applied for another SCOR grant to continue studying BCL-2 protein and apoptosis, including to "develop new

therapeutic approaches based on targeting Bcl-2-like proteins."
Id. ¶ 22.  The application was granted, and defendant received
$6,250,000 from July 1, 2006 to June 30, 2011 ("Grant 2" and with
Grant 1, the "SCOR Grants").  Id. ¶ 23.  Together, the SCOR Grants
allowed defendant, in its own words, "to pursue broad-ranging
research underpinning new therapies for cancer, in particular work
to define the roles of pro-survival and pro-death BCL-2 family
members."  Id. ¶ 25.

Critically, the SCOR Grants contemplated "license options
resulting from research conducted by [defendant] and funded in
whole or in part by [plaintiff]."  Id. ¶ 35.  In relevant part,
the SCOR Grants provided that defendant "shall, concurrently when
entering into such a license agreement, agree in writing to pay
[plaintiff] a portion of the equity and/or royalty amount received
by [plaintiff] under such license agreement, the amount to be paid
to [plaintiff] to reflect the proportion of research funding
contributed by [plaintiff]."  Id. ¶ 37 (emphasis added).  Under
the SCOR Grants, defendant also committed to protecting the
intellectual property ("IP") of plaintiff-funded work and to offer
to transfer title to plaintiff before abandoning IP rights of any
type.  Id. ¶ 38. Defendant further agreed that during the pendency
of the SCOR Grants, it would not participate in any agreement

involving its research for the "exclusive benefit" of defendant. Id. ¶ 39.

### 3. The License Agreement

In December 2006, unbeknownst to plaintiff, defendant signed a collaboration and license agreement with the pharmaceutical company Genentech, receiving an up-front payment and the potential for a percentage of future drug sales.  Id. ¶ 26.  According to plaintiff, the purpose of the collaboration "was to investigate potential therapeutic agents inhibiting the BCL-2 family of proteins for the treatment of cancer." Id. ¶ 27.  Quoting numerous statements made by defendant, plaintiff asserts that defendant obtained the license agreement with Genentech largely, if not entirely, as a result of the research that plaintiff funded through the SCOR Grants.  See id. ¶ 28.  For example, defendant stated that plaintiff's funding was the "lynchpin of [defendant's] work in the search for a new way to ameliorate leukemia and lymphoma" and that it "enabled a team of researchers at the Institute to pursue a long-term program that . . . underpinned the development of a new class of anti-cancer drugs."  Id.

Under the license agreement, defendant granted "exclusive worldwide rights" to Genentech for all of its BCL-2 research,

including its past, present, and future research until at least
2033.  Id. ¶ 30.  Defendant also allegedly granted Genentech an
exclusive license to all its IP rights "necessary or useful in the
research, development, making, using, selling, or offering for
sale" of BCL-2 inhibitors.  Id. ¶ 31.  In return, defendant would
receive a royalty on any successful BCL-2 inhibitor -- a 2.5
percent royalty if Genentech used the licensed information in a
product, and 2 percent royalty regardless.  Id. ¶ 33.

### 4. The Alleged Misstatements and Omissions

Despite the terms of the SCOR Grants regarding the licensing
of plaintiff-funded research, defendant failed to disclose to
plaintiff in December 2006 the "potential Genentech license and
agree in writing to share a portion of the royalties."  Id. ¶ 34.
While defendant "mentioned the Genentech collaboration to
[plaintiff] in May 2007, in its Grant 2 Year 1 report," it stated
only that it had "entered into a 'strategic alliance' with
Genentech" and reassured plaintiff that this "in no way overlaps"
with the support it was receiving from plaintiff.  Id. ¶ 40.
Elsewhere, on the final page of the 148-page report, defendant
noted in an asterisk that three of twenty-two listed patents were
licensed to Genentech under a "continuing collaboration."  Id.;
see also ECF No. 48-3 at 8.

Plaintiff alleges that this was the first of many instances in which defendant attempted to conceal its collaboration with Genentech.  In December 2008, when AbbVie (then Abbott) joined defendant's collaboration with Genentech, defendant prepared a draft notice letter to plaintiff, describing "for the first time its license of all BCL-2 research to Genentech a year earlier." Id. ¶ 41.  In the draft letter, defendant allegedly acknowledged its obligation under the SCOR Grants to pay plaintiff a proportion of any royalties from the collaboration with Genentech.  Id. However, according to plaintiff, defendant never sent the notice letter to plaintiff.  Id. ¶ 42.  This decision to withhold the notice letter from plaintiff allegedly followed an initial plan to send the notice "in a manner that [plaintiff] would be less likely to see."  Id.  In an email entitled "draft note to [plaintiff] re IP," Dr. Adams sent the draft letter to defendant's director of business development, Dr. Julian Clark ("Dr. Clark"), stating that "I propose sending it with the Annual Report, which is due May 1, if that is feasible (to attract less attention), but it could be sent separately."  Id.  Defendant opted not send the notice letter at all.  See id. ¶ 44.

In January 2009, as part of an audit, plaintiff sent defendant an email, inquiring "if any of the IP created during or in-part

with its funding is being used in a commercial setting or licensed out for further development to a company." Id. ¶ 45. Plaintiff alleges that defendant initially did not respond. Id. ¶ 46. After plaintiff followed up, however, defendant replied in March 2009. Id. ¶ 47. In its reply, defendant disclosed its "collaboration with Genentech and AbbVie," but failed to mention its licensing agreement with Genentech and even reassured plaintiff that with respect to the "funding provided to us by [plaintiff]," defendant had been "very conscientious about maintaining our IP."[2] Id.

Plaintiff thereafter requested a call to discuss defendant's collaboration with Genentech and AbbVie. Id. ¶ 50. On that call, plaintiff inquired whether it was entitled to a royalty. Id. In response, Dr. Clark "affirmatively told [plaintiff]" that it was not entitled to royalties because the project with Genentech and AbbVie "was a fully funded collaboration funded by Genentech and was separate from [plaintiff]." Id.

At some point after the call, Dr. Adams came to Manhattan for the annual grant presentation at which he reassured an executive

---

[2] Plaintiff also alleges that in this reply, defendant modified language from the unsent draft notice letter. Am. Compl. ¶ 49. Specifically, where defendant had previously written, "[n]aturally, this alliance has involved licensing our IP regarding the Bcl-2 family to Genentech" and mentioned its royalty-sharing provision with plaintiff, defendant now wrote that "[n]aturally, we will be happy to answer any further questions either of you may have." Id.

for plaintiff that defendant "had protected its [plaintiff]-funded IP" while neglecting to make any reference to the Genentech license. Id. ¶ 51. In June 2011, in its final Grant 2 report, defendant referenced "the commencement of our collaborative research agreement with Genentech during the previous reporting period." Id. ¶ 52. However, defendant again failed to mention the license portion of the collaboration.[3]  Id.

**5. The Successful Product**

In April 2016, AbbVie and Genentech released the first successful BCL-2 inhibitor called Venclexta (also known by its generic name, "venetoclax"). Id. ¶ 57. Days later, in an internal email with the subject "Venetoclax," researchers employed by defendant acknowledged that defendant's forthcoming royalties from Genentech resulted from plaintiff's funding, stating that defendant "secured the money from [plaintiff] that funded the drug discovery at [defendant] that then led to the collaboration with Genentech and later also involving AbbVie." Id. ¶ 57. Another researcher suggested celebrating the drug's release with plaintiff

---

[3] Between 2011 and 2016, defendant solicited plaintiff for millions of additional funds to continue working on BCL-2 therapy. Am. Compl. ¶ 53. Defendant received two more consecutive SCOR Grants from 2012 to 2022 ("Grants 3 and 4"), resulting in the award of another $11,250,000 to defendant. Id. ¶ 55. Thus, according to plaintiff, between 2000 and 2022, it provided defendant nearly $30 million in research funding. Id. ¶ 17.

in the hopes that it might lead to even more funding from plaintiff.  See id.

However, in the same internal email, another researcher warned that "the more we glorify our work during [plaintiff] grant, the more pressure will come on for some flow of royalty cash to [plaintiff]."  Id. ¶ 59.  Dr. Clark agreed, explaining that "as just mentioned[,] a real risk if we have a high profile . . . . [is that plaintiff] could claim a more direct relationship."  Id. ¶ 60.  He also warned about the "threat" to donations if defendant "is perceived as being rich from the 'rivers of gold'" it was about to receive.  Id.

Dr. Adams also agreed, stating that "I think too much praise of the role of [plaintiff] funding to our SCOR in the development of venetoclax might prove counterproductive from [defendant's] perspective."  Id. ¶ 61.  He rejected a proposal made by a researcher to bring in a plaintiff representative for a celebratory meeting with Genentech and Abbott because it "may unnecessarily flag to [plaintiff] the commercial aspects of our relationship" and "potentially lead to [plaintiff] requesting a significant share of the royalties, an issue that might not otherwise arise." Id.  Dr. Adams concluded that defendant should "keep a relatively

low profile with regard to [plaintiff] and the commercial aspect
of venetoclax development." Id.

**6. The Sale of Royalties**

In early 2017, after the Food and Drug Administration ("FDA")
approved the new BCL-2 inhibitor, plaintiff contacted defendant to
inquire whether it was entitled to royalties from Venclexta. See
id. ¶ 65. Specifically, plaintiff stated that it "may be entitled
to [a] return on our grant investment to [defendant], if
[defendant] has received funds (possibly from a pharma company)
related to our SCOR support." Id. Defendant delayed in
responding, blaming the delay on one of its employees being on
sick leave. Id. ¶ 66. However, plaintiff alleges, on information
and belief, that the real reason for defendant's delay in response
was that defendant "had been actively exploring a monetization
deal to sell its royalty from Genentech, which would include
selling [plaintiff's] share of the royalty, to a third party in
exchange for cash."[4] Id. ¶ 67.

Defendant continued to avoid substantively responding to
plaintiff until July 26, 2017, one day before defendant publicly

---

[4] Plaintiff alleges that defendant's internal communications from the days after
the drug's approval reference the "partial monetization" of drug royalties.
Am. Compl. ¶ 67.

announced that it had already completed a deal to sell the royalty rights to a pension fund for hundreds of millions of dollars.  See id. ¶ 68.  On that day, defendant's executive director Doug Hilton ("Dr. Hilton") sent a letter to plaintiff stating, allegedly "[f]or the first time," that defendant had licensed its BCL-2 protein research to Genentech in 2006.  Id. ¶ 69.  Dr. Hilton further wrote that defendant "maintains, at is has always done, the view that [plaintiff's] funding did not produce any [IP] which [defendant] has commercialised."  Id. ¶ 75.  Rather, in Dr. Hilton's words, defendant's royalty "was not based on its own discovery, but based on the development of a discovery of others, for which no [defendant] scientist is an inventor, and which was funded wholly by Genentech and AbbVie."  Id. ¶ 78.  The following day, defendant announced that it made "a landmark deal with up to US$325 million from the partial sale of royalty rights in anti-cancer treatment venetoclax."  Id. ¶ 72.

### 7. The Tolling Agreement

On October 3, 2019, the parties entered into a tolling agreement to preserve plaintiff's claims while the parties investigated and engaged in settlement discussions.  See id. ¶ 101. When the parties were unable to resolve their disputes, they extended the tolling agreement through November 5, 2022, during

which time the parties arbitrated plaintiff's claims under Grants 3 and 4, which are not at issue here.  See id.

**B.  Procedural History**

Plaintiff commenced this action on December 19, 2022.  ECF No. 1.  On April 24, 2023, defendant filed a pre-motion letter regarding its anticipated motion to dismiss plaintiff's complaint, to which plaintiff responded on April 27, 2023.  ECF Nos. 7, 11. The Court thereafter adjourned a pre-motion conference scheduled for May 31, 2023 after the parties advised that they were nearing an agreement that would allow plaintiff to file an amended complaint containing certain confidential information obtained in the prior arbitration that would be under seal.  See ECF Nos. 31, 33.  Accordingly, on July 19, 2023, the parties filed a stipulated protective order allowing the filing of such an amended complaint, which the Court so-ordered on August 10, 2023.  ECF Nos. 36-37.

On August 17, 2024, plaintiff filed an amended complaint in both a public redacted and an unredacted sealed form.  See ECF Nos. 39-40.  In its amended complaint, plaintiff asserts three causes of action against defendant, namely, (1) breach of contract based on, among other things, defendant's alleged failure to "concurrently" disclose the Genentech license to and enter into a

royalty sharing agreement with plaintiff, Am. Compl. ¶ 85; (2) breach of the covenant of good faith and fair dealing generally due to defendant's alleged ongoing scheme to mislead plaintiff about the licensing of plaintiff-funded research, see id. ¶¶ 89-92; and (3) fraud and fraudulent concealment based on dozens of statements made by defendant and its agents over the ten-year period between 2006 and 2017, see id. ¶¶ 94-98.

On August 31, 2023, defendant filed another pre-motion letter regarding its anticipated motion to dismiss the amended complaint. ECF No. 42.    On September 6, 2023, plaintiff responded to defendant's letter, ECF No. 43, and on September 13, 2023, the Court determined that defendant could bring its motion without the necessity of a pre-motion conference, ECF No. 44.

On October 13, 2023, defendant filed its motion to dismiss, including a memorandum of law in support of its motion and the Declaration of William B. Igoe ("Igoe Decl."), which includes numerous exhibits.    ECF Nos. 47-51.    On November 17, 2023, plaintiff filed its memorandum of law in opposition to defendant's motion. ECF Nos. 52-54.    On December 8, 2023, defendant filed its reply memorandum of law, ECF No. 55 ("Reply Br.") as well as additional exhibits to the Igoe Declaration, ECF Nos. 56-58.

## DISCUSSION

Defendant seeks to dismiss plaintiff's amended complaint under Federal Rule of Civil Procedure 12(b)(6) on the basis that (1) plaintiff's claims are time-barred by the applicable statute of limitations, and (2) plaintiff's implied covenant and fraud claims are impermissibly duplicative of its breach of contract claim. ECF No. 50 ("Mot.") at 12-21. In the alternative, defendant moves to dismiss the amended complaint pursuant to the doctrine of forum non conveniens. Id. at 22-31. We will address each of these arguments in turn.

### A.    Rule 12(b)(6)

As an initial matter, we construe defendant's motion to dismiss on the grounds of timeliness and duplicative claims as one brought under Rule 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Id.

In assessing the sufficiency of a complaint "we accept[] as true all factual allegations in the complaint, and draw[] all reasonable inferences in the plaintiff's favor." Barrows v. Burwell, 777 F.3d 106, 111 (2d Cir. 2015). Moreover, we may consider documents that are attached to the complaint, incorporated by reference in the complaint, or otherwise integral to the complaint. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

### 1. Statute of Limitations

Defendant has moved to dismiss all three of plaintiff's claims -- breach of contract, breach of the covenant of good faith and fair dealing, and fraud -- on the ground that they are barred by the statute of limitations. "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc., 988 F.3d 127, 131-32 (2d Cir. 2021). "On a motion to dismiss, a court may also evaluate whether a statute of limitations

may be equitably tolled where the factual basis for equitable tolling is apparent from the face of the complaint and other documents properly considered on a motion to dismiss." In re Bibox Grp. Holdings Ltd. Sec. Litig., 534 F. Supp. 3d 326, 338 (S.D.N.Y. Apr. 16, 2021) (citing cases). We first address the timeliness of the contract-based claims before turning to the fraud claim.

### a. Contract Claims[5]

Under New York law, the statute of limitations for contract claims is six years, see N.Y. C.P.L.R. § 213(2), which "begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered," ABB Indus. Sys. v. Prime Tech., 120 F.3d 351, 360 (2d Cir. 1997); see also MarketShare Corp. v. Transactis, Inc., No. 21 Civ. 750 (JSR), 2021 WL 1948283, at *5 (S.D.N.Y. May 12, 2021) ("A claim for breach of the implied covenant of good faith and fair dealing has a six-year statute of limitations, and such a claim accrues when the alleged breach occurs."). Defendant argues that because the alleged breach occurred in December 2006, when defendant entered into the Genentech agreement without "concurrently" entering into a royalty-sharing agreement with plaintiff, the six-year statute of

---

[5] Defendant addresses the timeliness of plaintiff's contract claims together, and so we will do likewise. ECF No. 50 ("Mot.") at 13-17.

limitations began to run in December 2006 and expired in December 2012, years before the parties' October 2019 tolling agreement. See ECF No. 50 ("Mot.") at 13.  While plaintiff does not dispute that its contract claims are prima facie time barred, plaintiff contends that defendant should be estopped from asserting its statute of limitations defense under the state-law doctrine of equitable estoppel.  Specifically, plaintiff argues that its contract claims are timely because they were equitably tolled until "at least July 2017," when defendant "first" told plaintiff about its collaboration with Genentech, following years of making "fraudulent statements" about its involvement with Genentech.  ECF No. 53 ("Opp.") at 11-12.  For the following reasons, we agree with plaintiff and conclude that the doctrine of equitable estoppel applies to plaintiff's otherwise untimely contract claims.

In New York, "[t]he doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense."  Zumpano v. Quinn, 6 N.Y.3d 666, 673 (2006).  Equitable estoppel is appropriate "where plaintiff was induced by fraud, misrepresentation or deception to refrain from filing a timely action."  Id. at 674.  Such fraud, misrepresentations, or deception must be "affirmative and specifically directed at preventing the plaintiff from bringing

suit; failure to disclose the basis for potential claims is not enough, nor are broad misstatements to the community at large." Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014), aff'd, 579 F. App'x 7 (2d Cir. 2014) (summary order).  To invoke the doctrine, a plaintiff "must also demonstrate reasonable reliance on the defendant's misrepresentations," as well as "[d]ue diligence in bringing a claim when the conduct relied upon as the basis for equitable estoppel ceases to be operational."  Id. at 442-43.

Here, plaintiff has pled sufficient facts to establish equitable estoppel.  Indeed, as alleged, in the years following its breach in December 2006, defendant repeatedly made deceptive or misleading statements about the true nature of its relationship with Genentech in what appears to have been part of a broader scheme to prevent plaintiff from uncovering a potential cause of action.

First, in May 2007, defendant submitted its annual progress report for Grant 2 in which it stated that it entered into a "strategic alliance" with Genentech that "in no way overlaps with the support we are receiving from [plaintiff]."  Am. Compl. ¶ 40. According to plaintiff, this statement was misleading because defendant's relationship with Genentech was far more than just a

mere "alliance."  In reality, it involved the licensing of "all BCL-2 related work, including [plaintiff]-funded work, to Genentech," which defendant failed to disclose.  Id.

Second, defendant's subsequent internal communications strongly suggest that defendant's initial description of its relationship with Genentech was intentionally misleading.  Indeed, in December 2008, defendant drafted a notice letter to plaintiff that truthfully and fully explained the nature of its collaboration with Genentech and, consistent with the SCOR Grant agreements, offered to pay plaintiff a portion of any future royalties.  In deciding how to provide this notice letter to plaintiff, Dr. Adams initially proposed sending it "with the Annual Report" so that it "attract[s] less attention."  Am. Compl. ¶ 42.  Ultimately, however, defendant chose not to send plaintiff the letter at all. Id.  Although these internal communications are not affirmative misrepresentations, they plainly support the inference that defendant was aware its May 2007 representation was misleading.

Third, in January 2009, as part of an audit, plaintiff expressly asked defendant "if any of the IP created during or in-part with its funding is being used in a commercial setting or

licensed out for further development to a company."[6]  Am. Compl.
¶ 45.   In its eventual response, defendant disclosed its
collaboration with Genentech, but critically did not mention
anything about the licensing agreement and further reassured
plaintiff that with respect to the "funding provided to us by
[plaintiff]," defendant had been "very conscientious about
maintaining our IP."  Id. ¶ 47.  Plaintiff, in turn, requested a
call to discuss defendant's collaboration with Genentech, during
which Dr. Clark stated that its collaboration was "fully funded"
by Genentech and was "separate from [plaintiff]."  Id. ¶ 50.  This,
too, was false because defendant had in fact licensed research
funded by plaintiff to Genentech, which, once again, defendant
failed to disclose.  See id.

Fourth, as before, defendant's subsequent internal
communications lend additional support to the conclusion that
defendant was knowingly misleading plaintiff about its
relationship with Genentech.  After Venclexta was released in April
2016, Dr. Adams rejected the suggestion that defendant invite
plaintiff to celebrate because it would "unnecessarily flag to
[plaintiff] the commercial aspects of our relationship" with

---

[6] As noted above, the grant agreement requires defendant to protect the IP of
any plaintiff-funded work and to transfer title to plaintiff before abandoning
IP rights of any type.  Am. Compl. ¶ 38.

-22-

Genentech and "potentially lead to [plaintiff] requesting a significant share of the royalties, an issue that might not otherwise arise." Id. ¶ 61. Again, these communications show that even though defendant actually believed it owed plaintiff royalties, it instead made the conscious decision to deceive and mislead plaintiff in order to conceal that it had breached its grant agreement with plaintiff. These misstatements, coupled with the well-pled scheme to conceal, are more than sufficient to establish that it would be unjust to deem plaintiff's contract claims untimely. See, e.g., Axiom Inv. Advisors, LLC v. Deutsche Bank AG, 234 F. Supp. 3d 526, 539-40 (S.D.N.Y. 2017) (finding that equitable estoppel was appropriate where a defendant "not only failed to disclose . . . but fraudulent concealed" its conduct, including by "providing a misleading explanation" of its conduct).

To resist the conclusion that equitable estoppel applies, defendant advances five principal arguments, none of which are persuasive. First, defendant argues that plaintiff was on notice of its licensing agreement with Genentech based on a single statement defendant made in its May 2007 annual progress report. See Reply Br. at 5. Specifically, defendant points to the final page of the 148-page report, where it noted in an asterisk below a sizable chart that 3 of its 22 patents were "[l]icensed to

Genentech, Inc. under a continuing early stage collaboration agreement." Igoe Decl., Ex. C at 8. When viewed in the light most favorable to plaintiff, however, this statement only deepens defendant's deception -- not only was it buried in essentially a footnote at the very end of the lengthy report, but it also did nothing to contradict or otherwise correct defendant's earlier misrepresentation in the report that its "alliance" with Genentech "in no way overlaps with the support [it is] receiving from [plaintiff]."[7] Am. Compl. ¶ 40. As such, the Court is persuaded that defendant's purported disclosure of its relationship with Genentech in the May 2007 annual report was itself misleading.

Second, contrary to defendant's contention, the allegations underlying plaintiff's equitable estoppel argument are separate from those supporting its contract claim. Mot. at 14-15. Defendant correctly observes that equitable estoppel does not apply where plaintiff fails to "identify any wrongful conduct by defendants separate from or subsequent to the acts underlying the causes of action in the Complaint that prevented it from timely filing [its] case." Id. at 14 (quoting Red Mt. Med. Holdings,

---

[7] Defendant argues that its statement about "overlap" pertained to overlap in funding, not overlap in subject matter. Mot. at 5-6. However, construing this statement in the light most favorable to plaintiff, it is entirely reasonable that plaintiff interpreted defendant's representation to mean that there was no overlap in the subject matter of the research conducted under the SCOR Grants and that which was licensed to Genentech.

Inc. v. Brill, 563 F. Supp. 3d 159, 179 (S.D.N.Y. 2021)). Here, however, the allegations are entirely distinct. Plaintiff's breach of contract claim is premised on defendant's initial failure to "concurrently" enter into a royalty sharing agreement in December 2006. Am. Compl. ¶ 85. By contrast, plaintiff's equitable estoppel theory relies solely on the misrepresentations that defendant made in the years following the initial breach in 2006. See id. ¶¶ 99-104. Therefore, defendant's argument that plaintiff impermissibly relies on the same core allegations is without merit.

Third, defendant contends that "concealment," on its own, cannot toll the statute of limitations. Mot. at 15. As a matter of New York law, defendant is correct: "passive concealment," absent allegations of "specific and affirmative misrepresentations," is insufficient to equitably toll the statute of limitations. Twerskey, 993 F. Supp. 2d at 444. However, plaintiff has alleged much more than mere "passive concealment." As is clear from the discussion above, plaintiff has alleged that defendant made numerous "specific and affirmative misrepresentations" about its relationship with Genentech, which is sufficient to trigger equitable estoppel.

Fourth, defendant asserts that plaintiff has failed to "affirmatively plead diligence in ascertaining the facts and bringing the claim." Mot. at 15 (quoting Cary Oil Co. v. MG Ref & Mktg., Inc., 90 F. Supp. 2d 401, 420 (S.D.N.Y. 2000)). Specifically, defendant claims that plaintiff should have demanded that defendant turn over the Genentech licensing agreement. Id. at 16. Under New York law, plaintiff need only demonstrate that it exercised "reasonable diligence" in uncovering the facts underlying its claim. Koch v. Christie's Int'l PLC, 699 F.3d 141, 157 (2d Cir. 2012). Here, plaintiff did far more. Specifically, plaintiff alleges that it: (1) required defendant to submit an annual report regarding the use of SCOR Grant funds, Am. Compl. ¶¶ 40, 52; (2) audited defendant in 2009, id. ¶ 45; (3) followed up after defendant failed to respond to the audit, id. ¶ 46; (4) requested a call to discuss defendant's eventual response to the audit, id. ¶ 50; (5) convened annual grant presentations with grantees, including defendant, id. ¶ 51; and (6) contacted defendant in early 2017 after the FDA approved Venetoclax, id. ¶ 65. Although plaintiff presumably could have demanded to see the Genentech agreement, as defendant suggests, it was entirely reasonable for plaintiff to take defendant -- a reputable research institution with whom plaintiff had a close relationship -- at its

word when it was explicitly asked, on several occasions, about the
nature of its collaboration with Genentech.  Therefore, we reject
defendant's argument that plaintiff failed to plead adequate
diligence.

Finally, defendant claims that it was unreasonable for
plaintiff to rely on defendant's representations -- namely, that
plaintiff was not entitled to royalties -- because they were merely
statements of opinion.  See Mot. at 16.  Generally, a statement of
opinion cannot supply the basis for equitable estoppel.  See Clear
Channel Outdoor, LLC v. City of New Rochelle, No. 20 Civ. 9296
(NSR)(AEK), 2022 WL 12404476, at *8 (S.D.N.Y. Oct. 20, 2022)
(citing cases).  However, assuming arguendo that defendant's
statements can be properly characterized as opinions, its own
internal communications directly undercut the notion that
defendant actually believed those opinions (i.e., that plaintiff
was not entitled to royalties).  Indeed, contrary to the
representations defendant made to plaintiff, the allegations
before us strongly suggest that defendant, behind closed doors,
believed that it in fact owed plaintiff royalties pursuant to the
parties' grant agreements.  Cf. Tongue v. Sanofi, 816 F.3d 199,
210 (2d Cir. 2016) (stating that statements of opinion are
considered false or misleading if at the time a statement was made,

-27-

"the speaker did not hold the belief she professed" (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186 (2015))). Therefore, we reject defendant's attempt to escape the application of equitable estoppel by couching its statements as ones of opinion.

For these reasons, the doctrine of equitable estoppel precludes defendant from asserting a statute of limitations affirmative defense against plaintiff's contract claims. As these claims did not accrue until plaintiff was finally on notice of defendant's alleged breach in July 2017, plaintiff's contract claims are timely. See Axiom Inv. Advisors, 234 F. Supp. 3d at 539 (denying motion to dismiss "to account for the tolling of the statute of limitations from the time that [defendant] induced [plaintiff] from filing the Complaint until [plaintiff] was again on notice of its claims").

### b. Fraud Claim

The statute of limitations for fraud is the "greater of" six years from when the cause of action accrues or two years after plaintiff "discovered the fraud [] or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). "The two-year period does not commence from the date that plaintiff has

positive knowledge of the fraud, but from the date that plaintiff becomes aware of enough operative facts so that, with reasonable diligence, [it] could have discovered the fraud." Kermanshah v. Kermanshah, 580 F. Supp. 2d 247, 264 n.30 (S.D.N.Y. 2008) (quoting Stride Rite Children's Grp., Inc. v. Siegel, 703 N.Y.S.2d 642, 643 (App. Div. 2000)).

Here, plaintiff was in possession of enough "operative facts" to discover the fraud "with reasonable diligence" in July 2017, when defendant first revealed its licensing agreement with Genentech. Indeed, as plaintiff itself alleges in its complaint, defendant "hid[] the ball for a decade [before] revealing it [in July 2017]." Am. Compl. ¶ 80. Thus, by July 2017 (but no sooner), plaintiff was in a position to, at the very least, further investigate whether defendant fraudulently concealed the true nature of its relationship with Genentech over the previous ten years. Over the ensuing two years, however, plaintiff apparently undertook no such investigative efforts. Instead, plaintiff waited until October 2019, when the parties entered into their tolling agreement, to begin investigating its potential claims. Therefore, because July 2017 was more than two years before the parties' October 2019 tolling agreement, plaintiff's fraud claim is time-barred by the statute of limitations.

Plaintiff disagrees, contending that its fraud claim is timely because it could not have reasonably discovered the fraud until "evidence of [defendant's] clear fraudulent intent was produced in or around June 2021," during arbitration proceedings involving Grants 3 and 4. Opp. at 21. However, there is no legal basis for plaintiff's assertion that the two-year clock only began running once plaintiff obtained sufficient evidence of defendant's "fraudulent intent." As discussed, all that is needed to commence the running of the statute is sufficient information to discover the fraud with "reasonable diligence" -- "positive knowledge of the fraud," much less actual evidence of fraudulent intent, is <u>not</u> what triggers the limitations period. <u>Kermanshah</u>, 580 F. Supp. 2d at 264 n.30

Moreover, plaintiff's suggestion that it could not assert a fraud claim without evidence of defendant's "fraudulent intent" is contrary to New York law. While a plaintiff asserting a fraud claim must "plead scienter," it "may do so generally" and need only allege "facts that give rise to a strong inference of fraudulent intent." <u>B&M Linen, Corp. v. Kannegiesser, USA, Corp.</u>, 679 F. Supp. 2d 474, 481 (S.D.N.Y. 2010). In other words, contrary to plaintiff's argument, plaintiff need <u>not</u> plead actual evidence of fraudulent intent to adequately state a claim of fraud under

New York law.  See id.  And, based on its own factual allegations,
plaintiff could have asserted its fraud claim as early as July
2017 when it finally learned that defendant's relationship with
Genentech did in fact involve a licensing agreement that may
entitle plaintiff to royalties.   Therefore, plaintiff's fraud
claim is time-barred by the statute of limitations and dismissed
on that basis.

### 2. Duplicative Claims

Defendant next contends that both plaintiff's implied
covenant and fraud claims impermissibly duplicate its breach of
contract claims.  Claims that are duplicative of others may be
dismissed under Rule 12(b)(6).  See, e.g., Concesionaria DHM, S.A.
v. Int'l Fin. Grp., 307 F. Supp. 2d 553, 564-65 (S.D.N.Y. 2004).
Because we have already dismissed the fraud claim as untimely, we
only address whether plaintiff's implied covenant claim is
duplicative of its breach of contract claim.  For the following
reasons, we conclude that the former are not duplicative of the
latter.

New York implies a covenant of good faith and fair dealing in
every contract.  See Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d
400, 407 (2d Cir. 2006); accord Singh v. City of New York, 40

N.Y.3d 138, 145 (2023).    "Encompassed within this implied
obligation are any promises which a reasonable person in the
position of the promisee would be justified in understanding were
included," including that "neither party shall do anything which
will have the effect of destroying or injuring the right of the
other party to receive the fruits of the contract."  Najjar Grp.,
LLC v. W. 56th Hotel LLC, 850 F. App'x 69, 72 (2d Cir. 2021)
(citing Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995))
(cleaned up).    However, New York "does not recognize a separate
cause of action for breach of the implied covenant of good faith
and fair dealing when a breach of contract claim, based upon the
same facts, is also pled."   Doyle v. Mastercard Int'l Inc., 700 F.
App'x 22, 24 (2d Cir. 2017) (quoting Harris v. Provident Life &
Accident Ins. Co., 310 F.3d 74, 81 (2d Cir. 2002)).    Therefore,
"when a complaint alleges both a breach of contract and a breach
of the implied covenant of good faith and fair dealing based on
the same facts, the latter claim should be dismissed as redundant."
Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013).

Here, plaintiff's claim of breach of the implied covenant is
premised on allegations distinct from those underlying its breach
of contract claim.    As alleged in the operative complaint,
plaintiff's breach of contract claim is based primarily on

defendant's failure in December 2006 to "concurrently" disclose the Genentech license to and enter into a royalty sharing agreement with plaintiff.  See Am. Compl. ¶ 85.  Thus, the alleged breach occurred at the moment defendant licensed its research to Genentech in 2006 while failing to simultaneously offer plaintiff a share of future royalties.

By contrast, plaintiff's claim for breach of the implied covenant is predicated on plaintiff's allegations that in years following December 2006, defendant violated an obligation implicit in the parties' agreement -- that defendant's required reporting would be "accurate and truthful" -- by repeatedly misrepresenting the nature of its relationship with Genentech.  Id. ¶ 91.  These alleged misrepresentations, such as those that defendant made in its annual report and in response to plaintiff's repeated inquiries, are not aimed at sustaining plaintiff's breach of contract claim.  Rather, it would appear that they are only meant to illustrate a broader scheme, pursuant to which defendant breached its implied duty to truthfully report its relationship with Genentech.  Therefore, at this stage, we cannot say that plaintiff's implied covenant claim is based on the same set of facts as its breach of contract claim.  Thus, we deny defendant's

motion to dismiss the implied covenant claim on the ground that it
is duplicative of the breach of contract claim.

**B.    Forum Non Conveniens[8]**

Defendant argues, in the alternative, that even though venue
is proper and that this Court has personal jurisdiction over
defendant, this case should be dismissed under the doctrine of
forum non conveniens.  Forum non conveniens is a discretionary
doctrine that permits a district court to dismiss claims when "a
court abroad is the more appropriate and convenient forum for
adjudicating the controversy." Sinochem Int'l Co. v. Malaysia
Int'l Shipping Corp., 549 U.S. 422, 425 (2007); see also Carey v.
Bayerische Hypo-Und Vereinsbank AG, 370 F.3d 234, 237 (2d Cir.
2004) (noting that forum non conevenines is a "discretionary device
permitting a court in rare instances to dismiss a claim even if
the court is a permissible venue with proper jurisdiction over the
claim."). In determining whether dismissal on forum non conveniens
grounds is appropriate, a court must assess: "(1) the deference to
be accorded to the plaintiff's choice of forum; (2) the adequacy
of the alternative forum proposed by the defendants; and (3) the

---

[8] A district court may consider the parties' affidavits and declarations when
deciding a forum non conveniens motion.  See Martinez v. Bloomberg LP, 740 F.3d
211 (2d Cir. 2014).

balance between the private and public interests implicated in the choice of forum." Fasano v. Yu Yu, 921 F.3d 333, 335 (2d Cir. 2019). After considering these factors, as we must, the Court concludes that they weigh against dismissing the case under the doctrine of forum non conveniens.

## 1. Deference to Plaintiff's Choice of Forum

The Second Circuit has instructed that "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations." Iragorri v. United Techs. Corp., 274 F.3d 65, 71 (2d Cir. 2001) (en banc). Nevertheless, a plaintiff's choice "is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." Id. Here, plaintiff is a not-for-profit public charity incorporated in New York with its principal place of business in Westchester County, which is located within the Southern District of New York. Am. Compl. ¶ 2. Therefore, plaintiff's choice to file suit in this Court is owed great deference, and defendant's arguments to diminish such deference are unpersuasive.

First, defendant argues that plaintiff's choice of forum is entitled to less deference because it opted to contract with a

foreign entity.  See Mot. at 23-24 (citing, e.g., Carey, 370 F.3d
at 238; Lazare Kaplan Int'l, Inc. KBC Bank N.V., 337 F. Supp. 3d
274, 297 (S.D.N.Y. 2018)).  However, these cases do not stand for
the proposition that "any plaintiff voluntarily conducting
business internationally is automatically entitled to lesser
deference with respect to her choice of forum." Petersen Energia
Invesora S.A.U. v. Argentine Republic, Nos. 15 Civ. 2739 (LAP), 16
Civ. 8569 (LAP), 2020 WL 3034824, at *8 (S.D.N.Y. June 5, 2020).
Indeed, the Second Circuit in Carey specifically clarified that it
was "in no way retreat[ing] from [its] emphasis . . . of the
presumptive validity of a United States resident's choice of a
United States forum for litigation." Carey, 370 F.3d at 238.

Moreover, in the cases relied upon by defendant, there were
other circumstances, not present here, that significantly
diminished any connection the case otherwise had to the United
States.  For example, in Carey, the plaintiff was a United States
citizen who, while living in Germany, voluntarily entered into a
contract with a German bank to purchase and finance an apartment
in Germany.  See id.  Upon returning to the United States, the
plaintiff sued the German bank in the Southern District of New
York to rescind the parties' contract, alleging she was
fraudulently induced to enter into it.  Id. at 236.  The Second

-36-

Circuit affirmed the dismissal on forum non conveniens grounds, concluding that the "transactions in Germany reasonably give rise to the expectation on all sides that any litigation arising from them will be conducted in Germany." Id. at 238. Likewise, in Lazare, although plaintiff was a New York corporation suing in its home forum, the "brunt of the alleged conduct took place outside of the United States" and "[n]one of the non-parties identified in the complaint [were] U.S. citizens." Lazare, 337 F. Supp. 3d at 298. Thus, because the "case's connection to New York [was] peripheral," the court accorded the plaintiff's choice of forum only a "moderate level of deference." Id.

Here, a significant portion of the events giving rise to the litigation took place in New York and involved a New York-based charity. Most obviously, in contrast to the plaintiff in Carey who affirmatively sought out a German bank while living in Germany to obtain a mortgage on German real property, here it was defendant who affirmatively applied for and received at least four grants from plaintiff, a New York-based charity, over the course of twenty years. Am. Compl. ¶ 6. Pursuant to these grants, defendant provided written annual grant reports to plaintiff's New York office and traveled to Manhattan for annual meetings regarding its use of plaintiff's funding. Id. As alleged, defendant made

-37-

several misstatements and omissions in those reports and at those
meetings, which now serve as the basis for at least two of
plaintiff's claims here.  Id.  Moreover, while the relevant non-
party entities in Lazare were not U.S. citizens, the only two non-
party entities here -- Genentech and AbbVie -- are United States
corporations with whom defendant collaborated, further
underscoring the ties this case has to the United States.[9]  Based
on these factual allegations, defendant cannot claim that it is
unreasonable or surprising that this litigation was brought in New
York.

Second, defendant argues that the deference owed to
plaintiff's forum choice is lessened because plaintiff is a large
organization that "can easily handle the difficulties of
litigation abroad."  Mot. at 23 (quoting Carey, 370 F.3d at 238).
Setting aside that defendant is also a major institution that has
retained legal counsel, which is perfectly capable of defending
its interests in the United States, "the Court does not understand
the Second Circuit [in Carey] to have indicated that every
corporation which does business abroad, no matter how limited, is

---

[9] See Genentech, Visit Us (last accessed August 16, 2024) (stating that its
headquarters are in San Francisco, California); AbBvie, Contact Center (last
accessed August 16, 2024) (stating that its headquarters are in North Chicago,
Illinois).

-38-

entitled to reduced deference in its choice of forum." <u>Airflow
Catalyst Sys., Inc. v. Huss Techs. GmbH</u>, No. 11 Civ. 6012 (CJS),
2011 WL 5326535, at *5 (W.D.N.Y. Nov. 3, 2011) (emphasis in
original).  Indeed, consistent with this principle, as plaintiff
points out, courts in this District routinely defer to large
organizations' choice of forum, including organizations that are
much larger than plaintiff.  <u>See, e.g.,</u> <u>Google LLC v. Starovikov</u>,
No. 21 Civ. 10260 (DLC), 2022 WL 1239656, at *6 (S.D.N.Y. Apr. 27,
2022) ("Google's choice of forum within the United States . . .
deserves significant deference."); <u>Bloomberg Fin. L.P. v. UBS AG</u>,
358 F. Supp. 3d 261, 267 (S.D.N.Y. 2018) ("Because Bloomberg has
its principal place of business in New York City, its choice to
file suit in this Court is owed great deference."); <u>Bank of Am.
Corp. v. Lemgruber</u>, 385 F. Supp. 2d 200, 235 (S.D.N.Y. 2005)
(holding that Bank of America's "choice of this forum" was entitled
to "significant deference").  Therefore, the deference owed to
plaintiff's choice of forum is not diminished simply because it is
a large organization that presumably has the resources necessary
to litigate this case abroad.

Finally, defendant argues in conclusory terms that
plaintiff's choice to litigate this case here "raise[s] questions
of forum shopping and reflect[s] an effort to inconvenience

[defendant]." Mot. at 24.  However, the Court does not detect any such improper motive on the part of plaintiff in electing to file this suit here.  To the contrary, all indications suggest that plaintiff sued defendant in this Court simply because "it is [plaintiff's] home district; because [defendant] is amenable to suit here; and because the suit seeks to vindicate contractual rights entered into in the State of New York." Bloomberg, 358 F. Supp. 3d at 268.  In short, the Court sees no reason to suspect that plaintiff's forum choice was motivated by anything but "legitimate reasons, including the plaintiff's convenience and the ability of a U.S. resident plaintiff to obtain jurisdiction over the defendant." Iragorri, 274 F.3d at 73.  In such circumstances, the deference owed to plaintiff's choice of forum is only further heightened.

For these reasons, the Court affords plaintiff's choice of forum substantial deference.  This deference "'recalibrate[s] the balance for purposes of the remaining analysis,' raising the bar that [defendant] must surpass at steps two and three." Glob. Art Exhibitions, Inc. v. Kuhn & Bulow Italia Versicherungsmakler GmbH, 607 F. Supp. 3d 421, 437 (S.D.N.Y. 2022) (quoting Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 157 (2d Cir. 2005)).

With this in mind, we now turn to assessing the second step of the test, whether there is an adequate alternative forum.

## 2. Adequate Alternative Forum

"The requirements for establishing that a forum is adequate are not strenuous." Mastafa v. Australian Wheat Bd. Ltd., 07 Civ. 7955 (GEL), 2008 WL 4378443, at *6 (S.D.N.Y. Sept. 25, 2008). An alternative forum is adequate if "(1) the defendants are subject to service of process there; and (2) the forum permits 'litigation of the subject matter of the dispute.'" Alfadda v. Fenn, 159 F.3d 41, 45 (2d Cir. 1998) (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981)).

Here, defendant has demonstrated that Australia is an adequate alternative forum. Mot. at 25-26. Plaintiff, for its part, does not dispute this conclusion, and courts in this District have reached the same conclusion on numerous occasions. See, e.g., Syed v. Morgan Stanley & Co. Inc., 09 Civ. 6342 (PAC), 2010 WL 11655493, at *3 (S.D.N.Y. Aug. 26, 2010) ("Australia is clearly an adequate alternative forum for [plaintiff's] claims."); Mastafa, 2008 WL 4378443, at *6 ("[T]here is no question that Australia would be an adequate alternative forum."). Accordingly, the Court

must proceed to assess the convenience to the parties of litigating this case in this Court.

### 3. Private and Public Interest Factors

At the final step of the <u>forum non conveniens</u> inquiry, the moving party must establish that a balancing of the "private and public interest factors tilts heavily in favor of the alternative forum." <u>Abdullahi v. Pfizer, Inc.</u>, 562 F.3d 163, 189 (2d Cir. 2009). In this case, defendant has failed to carry that burden.

### a. Private Interest Factors

The private interest factors, which relate to the "convenience of the litigants," include: (1) the ease of access to evidence; (2) the cost for witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten the trial or make it less expensive. <u>Iragorri</u>, 274 F.3d at 73-74.

With respect to these factors, defendant focuses primarily on the fact that Dr. Adams and Dr. Clark -- two witnesses whose alleged statements plaintiff relies on -- "are not agreeable to travel to the United States" due to health reasons. Mot. at 27. Defendant further notes, citing the attached declaration of an

expert on Australian law, that "there is no way to compel
Australian witnesses to travel to New York to testify at trial."
Id. (citing Dinelli Opinion ¶¶ 79-80).

However, defendant acknowledges that Dr. Adams, perhaps the
most important witness in this case, is a dual citizen of Australia
and the United States, whose testimony could be compelled at trial.
Mot. at 27 n.16 (citing 28 U.S.C. § 1783).[10]  Furthermore, if
defendant is legitimately concerned that Dr. Adams' medical
conditions would prevent him from testifying at trial, the parties
can preserve his testimony, including by taking his deposition in
Australia.  Indeed, the same is true of Dr. Clark, who cannot be
compelled to testify as a witness at trial here but whose testimony
could nonetheless be preserved in a similar manner.[11]

---

[10] Under 28 U.S.C. § 1783(a), the Court is authorized to issue a subpoena
requiring the appearance as a witness of "a national or resident of the United
States who is in a foreign country," if his testimony is "necessary in the
interest of justice."  To the extent Dr. Adams resisted a subpoena on the basis
of his medical condition, the Court could simply permit him to testify via live
video conference, as demonstrated by the case on which defendant itself relies.
Mot. at 27 n.16 (citing Sawant v. Ramsey, 2012 WL 1605450, at *3 (D. Conn. May
8, 2012) (allowing witnesses to give testimony via live video conference due to
reported health conditions)).

[11] Alternatively, although Dr. Clark could not be compelled to testify at trial
here, he could nonetheless provide testimony through live video conference.
Indeed, "courts in this Circuit have recognized that modern technologies can
make the location of witnesses and evidence less important to the forum non
conveniens analysis, particularly where the parties are major corporations."
Metito (Overseas) Ltd. v. Gen. Elec. Co., No. 05 Civ. 9478 (GEL), 2006 WL
3230301, at *6 (S.D.N.Y. Nov. 7, 2006); see also Citigroup Inc. v. City Holding
Co., 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000) ("[T]he unavailability of process
over third-party witnesses does not compel transfer where the practical
alternative of offering videotaped or deposition testimony of a given witness
exists.").  This principle has particular force in the aftermath of the COVID-

Moreover, the relative convenience to defendant's witnesses of litigating this case in Australia is largely offset by the inconvenience that such a transfer would pose for plaintiff's potential witnesses.  As plaintiff explains, "all potential [plaintiff] witnesses reside in the United States, including all of the [plaintiff] employees who interacted with [defendant] during the course of its SCOR grants."  Opp. at 32.  Even if defendant is correct that plaintiff will only call two witnesses for its case-in-chief, see Mot. at 12, dismissing this case on forum non conveniens grounds would mean that plaintiff's two witnesses would either have to travel to Australia or testify remotely, assuming an Australian court allowed them to do so -- the very same options available to Dr. Adams and Dr. Clark should the case be litigated here, see Shanahan v. Vallat, No. 03 Civ. 3496 (MBM), 2004 WL 2937805, at *11 (S.D.N.Y. Dec. 19, 2004) ("[W]herever the case is adjudicated, at least some of the parties and witnesses will incur expenses and be inconvenienced by travel.").  Therefore, whatever hardships defendant will face by

---

19 pandemic, during which courts and litigants successfully shifted much of their operations remotely.  In fact, as defendant notes, all of the testimony provided in the parties' prior arbitration, in which defendant prevailed, was conducted virtually.  See Mot. at 12 n.10.

litigating this case here are greatly diminished in light of the countervailing considerations discussed above.

In sum, considering that (1) Dr. Adams can be compelled to testify in the United States, (2) he and Dr. Clark's testimony could be preserved by taking their deposition in Australia, and (3) plaintiff's own witnesses would otherwise have to travel to Australia to testify, the private interest factors do not weigh in favor of litigating this case in Australia and "certainly not enough to overcome the heavy presumption in favor of [plaintiff's] choice of this forum." Lemgruber, 385 F. Supp. 2d at 238.

### b. Public Interest Factors

While the private interest factors measure the parties' convenience, the public interest factors, on the other hand, concern the burdens involved in the orderly administration of the case and relevant considerations include: (1) the administrative difficulties flowing from court congestion; (2) the interest in having local disputes settled locally; (3) the interest in avoiding problems associated with the application of foreign law; and (4) the interest in avoiding burdening jurors with cases that do not affect their community. Iragorri, 274 F.3d at 74. Here, these factors weigh decisively in plaintiff's favor.

Notably, the only public interest factor that defendant argues weighs in favor of litigating this matter in Australia is the first: that the Southern District of New York is "one of the busiest districts in this country." Mot. at 30 (quoting Lazare, 337 F. Supp. 3d at 303). However, this factor is neutral at best. "The Southern District of New York may have one of the nation's busiest dockets, but its administration is very efficient." Glob. Art Exhibitions, 607 F. Supp. 3d at 440. Moreover, when a federal court has a "full complement of judges for the District," as is currently the case in the Southern District, it makes the concern of judicial burden "of little or no present significance." Guidi v. Inter-Cont'l Hotels Corp., 224 F.3d 142, 146 n.5 (2d Cir. 2000). Accordingly, the first public interest factor does not weigh in defendant's favor.

The remaining factors each weigh in favor of litigating this case here. Most notably, "New York has an extremely strong interest in ensuring that [foreign entities] follow through on the commitments they make to New York citizens." Glob. Art Exhibitions, 607 F. Supp. 3d at 440. Additionally, defendant does not dispute that this case involves the application of New York law, which serves to "confirm[] our conclusion that the public interest factors favor retention." Fournier v. Starwood Hotels &

<u>Resorts Worldwide, Inc.</u>, 908 F. Supp. 2d 519, 525 (S.D.N.Y. 2012).
For these reasons, defendant has not shown, as it must in order to
overcome the strong presumption in favor of plaintiff's choice of
this forum, that the balancing of the "private and public interest
factors tilts heavily in favor of the alternative forum."
<u>Abdullahi</u>, 562 F.3d at 189.  Accordingly, defendant's motion to
dismiss under the doctrine of <u>forum non conveniens</u> is denied.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, defendant's motion to dismiss is
granted in part and denied in part.  Specifically, defendant's
motion is granted insofar as plaintiff's fraud claim is dismissed
as untimely.  However, defendant's motion to dismiss is denied as
to plaintiff's contract claims and to defendant's request to
dismiss the case under the doctrine of <u>forum non conveniens</u>.  The
Clerk of Court is respectfully directed to terminate the motion
pending at ECF No. 47.

**SO ORDERED.**

Dated:    August 20, 2024
          New York, New York

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

-47-